UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CHANNING HUTCHINS                                            Case No.: 23-CV-80210-ROSENBERG

    Plaintiff,

v.

FRONTIER AIRLINES, INC.; PALM
BEACH COUNTIES DEPARTMENT OF
AIRPORTS; and PALM BEACH COUNTY
SHERIFF OFFICE

    Defendants.
_____/

## FRONTER'S STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1(1), Defendant Frontier Airlines, Inc. ("Frontier") provides the following Statement of Material Facts:

1. On January 14, 2019, *pro se* Plaintiff, Channing Hutchins ("Plaintiff"), was a scheduled passenger on Frontier flight 257 ("subject flight"), Palm Beach, Florida (PBI) to Columbus, Ohio (CMH). (*See* ECF No. 36 at p. 4).

2. Three days prior to the subject flight, on January 11, 2019, Palm Beach County Sheriff's Office responded to a call of a suspicious person, identified as Plaintiff, at the second level atrium of PBI. (*See* Ex. B, Palm Beach County Sheriff's Office Records, at p. 2).

3. During this encounter, Plaintiff refused to provide a boarding pass. (*Id.*)

4. The responding officers also observed Plaintiff in the airport for the preceding three days. (*Id.*)

5. It was determined that plaintiff had a booked flight with Frontier scheduled to depart that day, but Plaintiff missed the flight because he was charging his phone away from the gate area. (*Id.*)

1

6. He was rescheduled on the subject flight scheduled to depart on January 14, 2019. (*Id*.)

7. Plaintiff told the responding officers that he was homeless, had no money, and no identification. (*Id*. at p. 3).

8. The responding officers advised Plaintiff that he could not return to PBI until January 14, 2019 as it appeared that Plaintiff had purposely missed his flight on January 11, 2019. If he failed to comply with these commands, he would be arrested. (*Id*.)

9. On January 14, 2019, Plaintiff encountered the Palm Beach Sheriff's Department at PBI at approximately at 7:13 a.m., when a sheriff received a call for a male sleeping in a chair on the east side of level 2 of PBI. (*Id.*, at pp. 16-17; 20-22).

10. Plaintiff did not have luggage, had a strong odor about his person, was unkept, and did not have any form of identification. (*Id*. at p. 22)

11. Later that day, at 2:34 p.m., less than one hour prior to the scheduled takeoff for flight 257, sheriffs again responded to a call of Plaintiff sleeping near the checkpoint C meet and greet area at PBI. (*Id. at* p. 15).

12. During the boarding process of the subject flight, Flight Attendant ("FA") Rachael Longoria was approached by at least eight passengers who complained of an unpleasant smell or odor present at gate C9 of PBI. (*See* Ex. C, Affidavit of Rachael Longoria at ¶ 5).

13. FA Longoria personally perceived Plaintiff's odor and described it as extreme body odor. (*Id*. at ¶ 8)

14. FA Longoria further witnessed passengers seated near Plaintiff cover their mouths and noses with their shirts in an attempt to evade the smell. (*Id*. at ¶ 6)

15. FA Longoria does not recall Plaintiff's race or ethnicity. (*Id*. at ¶ 10)

16. FA Debra Schwab stated that the odor was very extreme and permeated the entire aircraft cabin. (*See* Ex. D, Affidavit of Debra Schwab at ¶¶ 4-5).

17. FA Schwab also does not recall Plaintiff's race or ethnicity. (*Id.* at ¶ 6)

18. Passenger, Kevin Foster, was seated in 6B, directly next to Plaintiff and first encountered Plaintiff's smell during boarding. (*See* Ex. E, Affidavit of Kevin Foster at ¶¶ 3-4)

19. Mr. Foster observed Plaintiff and believed he appeared to be homeless as he did not have any luggage or carry-on on his person. (*Id.* at ¶ 5)

20. Mr. Foster stated that Plaintiff's smell was "horrible" and the worse body odor he's ever experienced. He put his shirt over his mouth and nose due to the smell. (*Id.* at ¶¶ 6-7)

21. Mr. Foster observed several other passengers seated in his vicinity complaining of the odor. (*Id.* at ¶8)

22. Mr. Foster further stated that the subject flight would have been extremely uncomfortable and difficult if Plaintiff was permitted to remain on the aircraft. (*Id.* at ¶¶ 6, 9)

23. Plaintiff's own Complaint admits that the reason for his removal was body odor. (*See* DE 36 at p. 2).

24. The Captain, Cyprian Bunker, was advised by the flight crew that numerous passengers throughout the aircraft complained about a severely offensive odor coming from Plaintiff and asked to be re-seated away from Plaintiff as a result. (*See* Ex. F, Affidavit of Cyprian Bunker at ¶ 5)

25. Captain Bunker was aware of a potential issue before boarding as he received communications from Customer Relations that Plaintiff had attempted to travel on prior flights. (*Id.* at ¶ 4)

26. First Officer ("FO"), Thomas Seymour, also recalled that, during boarding, several passengers strongly complained of Plaintiff's odor, nothing that it was extremely evident that Plaintiff had not bathed in a while. (*See* Ex. G, Affidavit of Thomas Seymour at ¶ 4).

27. FO Seymour stated that logistics quickly became a concern as passengers were refusing to sit in their assigned seats due to the odor that permeated the entire aircraft cabin. (*Id.* at ¶ 5)

28. After multiple passenger complaints, FA Longoria approached the CA Bunker to determine a course of action. (*See* Ex. C at ¶ 9)

29. The Captain and flight attendants determined that Plaintiff's odor would present a threat to passenger safety and comfort as well as interfere with the flight attendants' ability to adequately perform their duties in-flight. (*See* Ex. F at ¶¶ 6-7; Ex. G at ¶¶ 6-7; Ex. C at ¶ 10; Ex. D at ¶ 6)

30. Additionally, the flight crew was also unable to adequately respond to the passenger complaints as there were no available seats to relocate Plaintiff or other disgruntled passengers. (*See* Ex. C, at ¶ 7).

31. Therefore, Captain Bunker and FO Seymour determined there was no way to accommodate Plaintiff by relocating him to a different seat and Plaintiff's odor would continue to disturb and distract passengers and the flight crew if not removed. (*See* Ex. F at ¶ 6; Ex. G at ¶ 6)

32. Plaintiff was removed from Flight 257 and law enforcement removed him from the aircraft. (*See* Ex. F at ¶¶ 7-8; Ex G at ¶ 7).

33. Upon arrival, law enforcement advised that Plaintiff tried to fly aboard a different flight the day prior, but was refused service and was offered accommodations and a change of clothes. Plaintiff refused such offers. (Ex. G at ¶ 8)

34. Captain Bunker and FO Seymour were unaware of Plaintiff's race and did not visually perceive Plaintiff at the time the removal decision was made. (Ex. F at ¶ 9; Ex. G at ¶ 9)

35. It is within the Captain's duties and responsibilities to act for the safety, comfort, and wellbeing of all passengers aboard Flight 257, and thus, was authorized to refuse transportation to any passenger who might threaten or compromise the safety, wellbeing, or comfort of the passengers or flight crew. (*See* Ex. F at ¶ 7)

36. Additionally, pursuant to Frontier's Contract of Carriage, Section 3(B)(15), Frontier may refuse to provide transportation to any person or require any person leave an aircraft or be removed from an aircraft if the passenger interferes with any of member of the fight crew in pursuit of their duties or attempts to do so. (*See* Ex. H, Frontier's Contract of Carriage at p. 5).

Dated: September 5, 2023

Respectfully submitted,

*/s/ Brian T. Maye*

Brian T. Maye
(admitted *pro hac vice*)
Brittany N. Christianson
(admitted *pro hac vice*)
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60606
Phone: (312) 704-3000
Fax: (312) 704-3001
E-mail: bmaye@hinshawlaw.com

&

Steven D. Lehner
Florida Bar No. 39373
HINSHAW & CULBERTSON LLP
100 South Ashley Drive, Suite 1310
Tampa, Florida 33602
Phone: 813-868-8850
Fax: 813-276-1956
E-mail: slehner@hinshawlaw.com

*Counsel for Frontier Airlines, Inc.*

6