FILED BY NC D.C.

SEP 19 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CHANNING HUTCHINS Case No.: 23-CV-80210-ROSENBERG
Plaintiff,
v.
FRONTIER AIRLINES, INC.; PALM
BEACH COUNTIES DEPARTMENT OF
AIRPORTS; and PALM BEACH COUNTY
SHERIFF OFFICE
Defendants.
_____/

**Plaintiffs ANSWERS TO FRONTER'S STATEMENT OF MATERIAL FACTS**
Pursuant to Local Rule 56.1(1), Defendant Frontier Airlines, Inc. ("Frontier") provides the following Statement of Material Facts:

1. On January 14, 2019, *pro se* Plaintiff, Channing Hutchins ("Plaintiff"), was a scheduled passenger on Frontier flight 257 ("subject flight"), Palm Beach, Florida (PBI) to Columbus, Ohio (CMH). (*See* ECF No. 36 at p. 4).

2. Three days prior to the subject flight, on January 11, 2019, Palm Beach County Sheriff's Office responded to a call of a suspicious person, identified as Plaintiff, at the second level atrium of PBI. (*See* Ex. B, Palm Beach County Sheriff's Office Records, at p. 2).

Answer: This has nothing to do with the case and needs to be removed. Unless Frontier Airlines is admitting to motive and intent to remove passenger other than an odor based on suspicion by law enforcement.

3. During this encounter, Plaintiff refused to provide a boarding pass. (*Id.*)

Answer: This information is not true. I would have showed the officers the boarding pass, if I had access to it.

4. The responding officers also observed Plaintiff in the airport for the preceding three days. (*Id.*)

Answer: This information is not true. I did not have any interactions with any of the law enforcement until the officers inquired to my business at the airport.

5. It was determined that plaintiff had a booked flight with Frontier scheduled to depart that day, but Plaintiff missed the flight because he was charging his phone away from the gate area. (*Id.*)

Answer: It was confirmed because I probably showed them the boarding pass, but there were not any concerns that defect the character, or further promulgated suspicion at the airport.

We have confirmed that the validity of the initial contact with police was in error as Mr. Hutchins had a scheduled flight, but the reason for the rebooking is not recollected.

6. He was rescheduled on the subject flight scheduled to depart on January 14, 2019.(*Id.*)

Answer: Yes. I was luckily able to reschedule the flight.

7. Plaintiff told the responding officers that he was homeless, had no money, and no identification. (*Id.* at p. 3).

Answer: I do not recall informing the officers about any duress situation of homelessness or money, and I did not have a identification to provide them.

8. The responding officers advised Plaintiff that he could not return to PBI until January 14, 2019 as it appeared that Plaintiff had purposely missed his flight on January 11, 2019. If he failed to comply with these commands, he would be arrested. (*Id.*)

Answer: I do not recall the conversation being that intense , especially with the validity of travel on the day of the encounter, but I was advised due to missing the flight that I couldn't wait a few days in the airport.

9. On January 14, 2019, Plaintiff encountered the Palm Beach Sheriff's Department at PBI at approximately at 7:13 a.m., when a sheriff received a call for a male sleeping in a chair on the east side of level 2 of PBI. (*Id.*, at pp. 16-17; 20-22).

Answer: I do not recall encountering law enforcement that morning, but there was not any issue getting through TSA, or finding a seat at the terminal gate.

10. Plaintiff did not have luggage, had a strong odor about his person, was unkept, and did not have any form of identification. (*Id.* at p. 22)

Answer: No. I did not have a strong odor, and you are not required to have luggage or a carry on bag.

11. Later that day, at 2:34 p.m., less than one hour prior to the scheduled takeoff for flight 257, sheriffs again responded to a call of Plaintiff sleeping near the checkpoint C meet and greet area at PBI. (*Id.* at p. 15).

Answer: No. Law enforcement did not respond in the terminal until removal of the aircraft.

12. During the boarding process of the subject flight, Flight Attendant ("FA") Rachael Longoria was approached by at least eight passengers who complained of an unpleasant smell or odor present at gate C9 of PBI. (*See* Ex. C, Affidavit of Rachael Longoria at ¶ 5).

Answer: FA Longoria did not approach Mr. Hutchins, and he did not see any passengers walk back after passing through the aircraft.

13. FA Longoria personally perceived Plaintiff's odor and described it as extreme body odor. (*Id.* at ¶ 8)

Answer: FA Longoria did not ever approach Mr. Hutchins to make any assessment, and easily may have mistaken the odor as flutenance, or odor from another passenger.

14. FA Longoria further witnessed passengers seated near Plaintiff cover their mouths and noses with their shirts in an attempt to evade the smell. (*Id.* at ¶ 6)

Answer: No. Mr. Hutchins did not notice anyone visually humiliate him, or make a mockery of any hygienic concern.

15. FA Longoria does not recall Plaintiff's race or ethnicity. (*Id.* at ¶ 10)

Answer: No. Mr. Hutchins is a bigger black guy, and easily describe, and is not being honest.

16. FA Debra Schwab stated that the odor was very extreme and permeated the entire aircraft cabin. (*See* Ex. D, Affidavit of Debra Schwab at ¶¶ 4-5).

Answer: FA Debra Schwab did not approach Mr. Hutchins and did not properly verify the culprit to an odor concern.

17. FA Schwab also does not recall Plaintiff's race or ethnicity. (*Id.* at ¶ 6)

Answer: FA Schwab is not being honest as Mr. Hutchins was the minority on the aircraft.

18. Passenger, Kevin Foster, was seated in 6B, directly next to Plaintiff and first encountered Plaintiff's smell during boarding. (*See* Ex. E, Affidavit of Kevin Foster at ¶¶ 3-4)

Answer: Passenger Kevin Foster did not divulge any information, and Mr. Hutchins does not recollected Mr. Foster speaking with the flight crew.

19. Mr. Foster observed Plaintiff and believed he appeared to be homeless as he did not have any luggage or carry-on on his person. (*Id.* at ¶ 5)

Answer: Mr. Foster should not be evaluating a persons dwelling situation or homelessness based on not having carry on luggage.

20. Mr. Foster stated that Plaintiff's smell was "horrible" and the worse body odor he's ever experienced. He put his shirt over his mouth and nose due to the smell. (*Id.* at ¶¶ 6-7)

Answer: Mr. Foster never put his shirt over his mouth, and it appears that he is lacking maturity for both the integrity of another human being, and humiliation because Mr. Hutchins did not have a odor as he freshened up before the flight.

21. Mr. Foster observed several other passengers seated in his vicinity complaining of the odor. (*Id.* at ¶8)

Answer: Mr. Hutchins did not have a odor from a hygienic issue.

22. Mr. Foster further stated that the subject flight would have been extremely uncomfortable and difficult if Plaintiff was permitted to remain on the aircraft. (*Id.* at ¶¶ 6, 9)

Answer: Mr. Hutchins is owed the same standard duty of care free from cruel torment, fear, humiliation, and racism to remove him from the aircraft; This is a budget flight as low grade as public bus transportation, an airline has the responsibility to make it as comfortable as possible, and Frontier' has air purification systems and takes cleaning protocols, but it's not their responsibility to make sure that passengers have the accessories for budget flying of carry on bags and cologne.

23. Plaintiff's own Complaint admits that the reason for his removal was body odor. (*See* DE 36 at p. 2).

Answer: The Sheriff Department confirmed this was not acceptable and a body odor did not exist that substantiates, creates, or should have been reason for the removal.

24. The Captain, Cyprian Bunker, was advised by the flight crew that numerous passengers throughout the aircraft complained about a severely offensive odor coming from Plaintiff and asked to be re-seated away from Plaintiff as a result. (*See* Ex. F, Affidavit of Cyprian Bunker at ¶ 5)

Answer: Originally. Frontier Airlines Incorporated mentioned that Captain Cyprian Bunker was not involved due to his overwhelming role, and duties had been assigned to flight crew.

25. Captain Bunker was aware of a potential issue before boarding as he received communications from Customer Relations that Plaintiff had attempted to travel on prior flights. (*Id.* at ¶ 4)

Answer: Mr. Hutchins had not attempted to travel on any other flight. Where are they getting this stuff?

26. First Officer ("FO"), Thomas Seymour, also recalled that, during boarding, several passengers strongly complained of Plaintiff's odor, nothing that it was extremely evident that Plaintiff had not bathed in a while. (*See* Ex. G, Affidavit of Thomas Seymour at ¶ 4).

Answer: I had just freshened up before the flight and a odor was not present.

27. FO Seymour stated that logistics quickly became a concern as passengers were refusing to sit in their assigned seats due to the odor that permeated the entire aircraft cabin. (*Id*. at ¶ 5)

Answer: Mr. Hutchins did not notice any of the activity, unless the flight attendants notified onboarding passengers about the alleged odor prior to seating.

28. After multiple passenger complaints, FA Longoria approached the CA Bunker to determine a course of action. (*See* Ex. C at ¶ 9)

Answer: Again this confuses me as they previously stated the pilots were not involved and flight crew made the decision.

29. The Captain and flight attendants determined that Plaintiff's odor would present a threat to passenger safety and comfort as well as interfere with the flight attendants' ability to adequately perform their duties in-flight. (*See* Ex. F at ¶¶ 6-7; Ex. G at ¶¶ 6-7; Ex. C at ¶ 10; Ex. D at ¶ 6)

Answer: An odor issue does not constitute any level of safety concern, and changing a standard policy for comfort denied Mr. Hutchins his standard duty of care and respect.

30. Additionally, the flight crew was also unable to adequately respond to the passenger complaints as there were no available seats to relocate Plaintiff or other disgruntled passengers. (*See* Ex. C, at ¶ 7).

Answer: They should not have contacted the law enforcement.

31. Therefore, Captain Bunker and FO Seymour determined there was no way to accommodate Plaintiff by relocating him to a different seat and Plaintiff's odor would continue to disturb and distract passengers and the flight crew if not removed. (*See* Ex. F at ¶ 6; Ex. G at ¶ 6)

Answer: They did not properly investigate the situation, or find the actual person that had a extreme body odor, as Mr. Hutchins did not have the same result flying with Delta Airlines.

32. Plaintiff was removed from Flight 257 and law enforcement removed him from the aircraft. (*See* Ex. F at ¶¶ 7-8; Ex G at ¶ 7).

Answer: They failed to properly investigate and should not have contacted law enforcement.

33. Upon arrival, law enforcement advised that Plaintiff tried to fly aboard a different flight the day prior, but was refused service and was offered accommodations and a change of clothes. Plaintiff refused such offers. (Ex. G at ¶ 8)

Answer: This is rude. Mr. Hutchins did not try to fly thr day prior without a valid ticket, and wouldn't have made it pass TSA screening to be denied service.

He was not offered any accommodations, or any change of clothes. This is a lie!

34. Captain Bunker and FO Seymour were unaware of Plaintiff's race and did not visually perceive Plaintiff at the time the removal decision was made. (Ex. F at ¶ 9; Ex. G at ¶ 9)

Answer: Captain Bunker mentioned he was provided a description from Customer Relations, and the alleged complaints are mentioning appearance and good looks that seemingly is followed by race and color. He had intent and motive.

35. It is within the Captain's duties and responsibilities to act for the safety, comfort, and wellbeing of all passengers aboard Flight 257, and thus, was authorized to refuse transportation to any passenger who might threaten or compromise the safety, wellbeing, or comfort of the passengers or flight crew. (*See* Ex. F at ¶ 7)

Answer: Captain Bunker failed to maintain his standard duty of care to Mr. Hutchins and significantly traumatized him with fear of further harm, persecution, and potential criminal sanctions; And the aircraft, airport, police, or other travelo

36. Additionally, pursuant to Frontier's Contract of Carriage, Section 3(B)(15),
Frontier may refuse to provide transportation to any person or require any person leave an aircraft or be removed from an aircraft if the passenger interferes with any of member of the fight crew in pursuit of their duties or attempts to do so. (*See* Ex. H, Frontier's Contract of Carriage at p. 5).

Answer:
Under the federal regulation, Frontier Airlines Incorporated may not remove a passenger unless it's listed under the guidance of safety and security; Department of Transportation has outlined reasoning permitted and an odor is not listed.



